Susana SIDERMAN de BLAKE, Jose Siderman, Carlos Siderman, and Lea Siderman, individuals, Plaintiffs–Appellants,

v.

The REPUBLIC OF ARGENTINA, a foreign country; The Province of Tucuman of the Republic of Argentina, a province of a foreign country; Oscar Honorato, Abelardo Garcia, Carlos Rosales, Juan Roman Diosque, Victor Eduardo Molina, General Bussi, Captain Abas, General Forzano, General Merlo, individuals; and Inmobiliaria Del Nor–Oeste, S.A., an Argentine Corporation, Defendants–Appellees.

No. 85–5773.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 3, 1991.

Decided May 22, 1992.

Michael J. Bazyler, Whittier College School of Law, Paul L. Hoffman, ACLU Foundation of Southern California, Los Angeles, Cal., Scott W. Wellman, Wellman & Cane, Newport Beach, Cal., for plaintiffs-appellants.

Bruno A. Ristau, Kaplan, Russin & Vecchi, Washington, D.C., for defendants-appellees.

Betsy R. Rosenthal, Los Angeles, Cal., for amicus curiae Anti–Defamation League of B'Nai B'Rith.

Before: FLETCHER, CANBY and BOOCHEVER, Circuit Judges.

FLETCHER, Circuit Judge:

Susana Siderman de Blake and Jose, Lea, and Carlos Siderman (collectively, "the Sidermans") appeal the dismissal of their action against the Republic of Argentina and the Argentine Province of Tucuman (collectively, "Argentina"). The Sidermans' complaint alleged eighteen causes of action arising out of the torture of Jose Siderman and the expropriation of the Sidermans' property by Argentine military officials. The district court dismissed the expropriation claims on the basis of the act of state doctrine, but granted a default judgment to Jose and Lea Siderman on the torture claims. Argentina then entered its first appearance in the case and moved for relief from judgment on the ground that the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602–11, rendered it immune from the Sidermans' action. The district court granted the motion and vacated the default judgment. The Sidermans now appeal. We reverse and remand for further proceedings.

## FACTS

The factual record, which consists only of the Sidermans' complaint and numerous

declarations they submitted in support of their claims, tells a horrifying tale of the violent and brutal excesses of an anti-Semitic military junta that ruled Argentina. On March 24, 1976, the Argentine military overthrew the government of President Maria Estela Peron and seized the reins of power for itself, installing military leaders of the central government and the provincial governments of Argentina.[1] That night, ten masked men carrying machine guns forcibly entered the home of Jose and Lea Siderman, husband and wife, in Tucuman Province, Argentina. The men, who were acting under the direction of the military governor of Tucuman, ransacked the home and locked Lea in the bathroom. They then blindfolded and shackled 65–year old Jose, dragged him out of his home, tossed him into a waiting car, and drove off to an unknown building. For seven days the men beat and tortured Jose. Among their tools of torture was an electric cattle prod, which they used to shock Jose until he fainted. As they tortured him, the men repeatedly shouted anti-Semitic epithets, calling him a "Jew Bastard" and a "Shitty Jew." They inflicted all of these cruelties upon Jose Siderman because of his Jewish faith.

At the end of this nightmarish week, his body badly bruised and his ribs broken, Jose was taken out of the building and driven to an isolated area, where the masked men tossed him out of the car. The men told Jose that if he and his family did not leave Tucuman and Argentina immediately, they would be killed. On the day of Jose's release, he and Lea fled to Buenos Aires in fear for their lives. Their son Carlos followed shortly thereafter, and the night Carlos left Tucuman, military authorities ransacked his home. In June 1976, Jose, Lea, and Carlos left Argentina for the United States, where they joined Susana Siderman de Blake. She is the daughter of Jose and Lea and is a United States citizen.

Before the hasty flight from Tucuman to Buenos Aires, Jose was forced to raise cash by selling at a steep discount part of his interest in 127,000 acres of land. Prior to their departure for the United States, the Sidermans also made arrangements for someone to oversee their family business, Inmobiliaria del Nor–Oeste, S.A. ("INO-SA"), an Argentine corporation. Susana Siderman de Blake, Carlos Siderman and Lea Siderman each owned 33% of INOSA and Jose owned the remaining one percent. Its assets comprised numerous real estate holdings including a large hotel in Tucuman, the Hotel Gran Corona. The Sidermans granted management powers over INOSA to a certified public accountant in Argentina.

After the Sidermans left Argentina for the United States, Argentine military officers renewed their persecution of Jose. They altered real property records in Tucuman to show that he had owned not 127,-000, but 127, acres of land in the province. They then initiated a criminal action against him in Argentina, claiming that since he owned only 127 acres he had sold land that did not belong to him. Argentina sought the assistance of our courts in obtaining jurisdiction over his person, requesting via a letter rogatory that the Los Angeles Superior Court serve him with documents relating to the action. The court, unaware of Argentina's motives, complied with the request.

Soon thereafter, while he was travelling in Italy, Jose was arrested pursuant to an extradition request from Argentina to the Italian government. Argentina charged that Jose had fraudulently obtained the travel documents enabling him to leave Argentina in 1976. Jose was not permitted to leave Cremora, Italy, for seven months, and actually was imprisoned for 27 days, before an Italian Appeals Court finally held that Argentina's extradition request would not be honored, as it was politically motivated and founded on pretextual charges.

The Argentine military also pursued IN-OSA with vigor. In April 1977, INOSA

---

**1.** A general description of the military coup and its aftermath can be found in *Forti v. Suarez–*

*Mason,* 672 F.Supp. 1531, 1536 (N.D.Cal.1987).

was seized through a sham "judicial intervention," a proceeding in which property is put into receivership. The purported reasons for the intervention were that INOSA lacked a representative in Argentina and that INOSA had obtained excessive funds from a Tucuman provincial bank. Though these reasons were pretexts for persecuting the Sidermans because of their religion and profiting from their economic success, the Sidermans were unable to oppose the intervention because Argentine officials had imprisoned and killed the accountant to whom they had granted management powers over INOSA. In 1978, the Sidermans retained an attorney in Argentina and brought a derivative action in a Tucuman court in an effort to end the intervention. The court ordered that the intervention cease, and the order was upheld by the Supreme Court of Tucuman, but the order remains unenforced and the intervention has continued. Argentine military officials and INOSA's appointed receivers have extracted funds from INOSA, purchased various assets owned by INOSA at sharply discounted prices, and diverted INOSA's profits and revenues to themselves.

In 1982, Jose, Lea, and Carlos, who by then had become permanent residents of the United States, and Susana, a United States citizen since 1967, turned to federal court for relief. They filed a complaint asserting eighteen causes of action based on the torture and harassment of Jose by Argentine officials and the expropriation of their property in Argentina. Named defendants included the Republic of Argentina, the Province of Tucuman, INOSA, and numerous individual defendants who participated in the wrongdoing. In December 1982, the Sidermans properly served Argentina and Tucuman with the Summons and Complaint. The Argentine Embassy subsequently sought assistance from the U.S. State Department, which informed Argentina that it would have to appear and present any defenses it wished to assert to the district court, including the defense of sovereign immunity, or risk a default judgment. The State Department also provided a directory of lawyer referral services. Despite receiving this information, Argentina did not enter an appearance, and the Sidermans filed a motion for default judgment.

On March 12, 1984, the district court dismissed the Sidermans' expropriation claims *sua sponte* on the basis of the act of state doctrine and ordered a hearing for the Sidermans to prove up their damages on the torture claims.[2] The Sidermans moved for reconsideration of the court's dismissal of the expropriation claims. On September 28, 1984, the court denied the motion for reconsideration and entered a default judgment on the torture claims, awarding Jose damages and expenses totalling $2.6 million for his torture claims and awarding Lea $100,000 for her loss of consortium claim.[3]

The damages award finally elicited a response from Argentina, which filed a motion for relief from judgment on the ground that it was immune from suit under the FSIA and that the district court therefore lacked both subject matter and personal jurisdiction. The United States filed a suggestion of interest, asking the court to consider the issue of foreign sovereign immunity but indicating no view of the merits. On March 7, 1985, the district court vacated the default judgment and dismissed the Sidermans' action on the ground of Argentina's immunity under the FSIA.[4]

2. The district court also dismissed the claims against the individual defendants for lack of personal jurisdiction because they were never served. The Sidermans are not challenging this ruling on appeal.

3. Lea, Carlos, and Susana were found to lack standing to claim damages for Jose's torture, and they do not appeal this ruling of the district court.

4. The court did not reach the question of personal jurisdiction, nor do the parties argue the issue on appeal. The FSIA provides that personal jurisdiction exists if subject matter jurisdiction exists and proper service has been made under the FSIA. *See* 28 U.S.C. § 1330(b). Nevertheless, the exercise of personal jurisdiction also must comport with the constitutional requirement of due process. *See Olsen by Sheldon v. Government of Mexico,* 729 F.2d 641, 648–51 (9th Cir.), *cert. denied,* 469 U.S. 917, 105 S.Ct. 295, 83 L.Ed.2d 230 (1984).

The Sidermans filed a timely notice of appeal on April 5, 1985.[5] .We have jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

## DISCUSSION

█ Until 1952, foreign states and their agencies and instrumentalities enjoyed virtually absolute immunity from suit in the courts of the United States. *See Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 486, 103 S.Ct. 1962, 1967, 76 L.Ed.2d 81 (1983). Chief Justice John Marshall authored the seminal opinion that considered and recognized the immunity of a foreign state from suit in a United States court. In *The Schooner Exchange v. M'Faddon,* 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812), the Court upheld a French plea of immunity against an American citizen's assertion of title to an armed national vessel of France that had entered the territorial waters of the United States. In his opinion for the Court, Chief Justice Marshall first emphasized the "exclusive and absolute" nature of a nation's territorial jurisdiction, any exception to which could arise only from the consent or waiver of that nation. 11 U.S. (7 Cranch) at 136. He then explained:

> The world being composed of distinct sovereignties, possessing equal rights and equal independence, ... all sovereigns have consented to a relaxation in practice, in cases under certain peculiar circumstances, of that absolute and complete jurisdiction within their respective territories which sovereignty confers.

*Id.* Thus, Chief Justice Marshall announced that the common practice of nations forms the foundation for the doctrine of foreign sovereign immunity, while a given state's agreement to grant immunity in a particular case is a matter of grace, comity, and respect for the equality and independence of other sovereigns. *See Verlinden,* 461 U.S. at 486, 103 S.Ct. at 1967. Although *The Schooner Exchange* did not

announce a rule of absolute sovereign immunity, in the following 140 years absolute immunity became the norm, principally because the courts practiced consistent deference to the Executive Branch, which "ordinarily requested immunity in all actions against friendly foreign sovereigns." *Id.*

In 1952, however, the Acting Legal Adviser of the State Department, Jack Tate, sent a letter to the Acting Attorney General announcing that the State Department was adopting the "restrictive" principle of foreign sovereign immunity. *Id.* at 487 & n. 9, 103 S.Ct. at 1968 & n. 9. Under the restrictive principle, as defined in the Tate Letter, "the immunity of the sovereign is recognized with regard to sovereign or public acts *(jure imperii)* of a state, but not with respect to private acts *(jure gestionis)*." 26 Dep't of State Bull. 984 (1952), *reprinted in Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 711, 96 S.Ct. 1854, 1869, 48 L.Ed.2d 301 (1976) (Appendix 2). With the issuance of the Tate Letter, the United States joined the emerging international consensus that private acts of a sovereign—commercial activities being the primary example—were not entitled to immunity. While the Tate Letter altered the Executive Branch's view of foreign sovereign immunity, it did not provide the courts with concrete legislative standards for determining whether to assert jurisdiction over actions against foreign states. Thus, the courts continued to defer to the Executive Branch. When the State Department issued a suggestion of immunity in a particular case, the court. followed it; when the State Department remained silent, the court relied on prior suggestions for precedential assistance in determining immunity. *Verlinden,* 461 U.S. at 487, 103 S.Ct. at 1968.

With the enactment of the FSIA in 1976, Congress replaced the regime of deference to Executive suggestion with a comprehensive legislative framework "governing claims of immunity in every civil action against a foreign state or its political subdi-

---

5. Since filing the notice, the Sidermans have sought and obtained nine six-month stays of the appeal while they pursued an ultimately unsuccessful suit in Argentina that could have mooted the present case. On October 15, 1990, in light of Argentina's opposition to the ninth stay, the stay was vacated and the briefing schedule set.

visions, agencies, or instrumentalities." *Id.* at 488, 103 S.Ct. at 1968; H.R.Rep. No. 1487, 94th Cong., 2d Sess. 7, *reprinted in* 1976 U.S.Code Cong. & Admin.News 6604, 6606 ("A principal purpose of this bill is to transfer the determination of sovereign immunity from the executive branch to the judicial branch...."). In essence, the FSIA codified the restrictive theory of sovereign immunity, which had become widely accepted in international law. *See Verlinden,* 461 U.S. at 487–88, 103 S.Ct. at 1968; H.R.Rep. No. 1487, 94th Cong., 2d Sess. 14, 1976 U.S.Code Cong. & Admin.News at 6613 (referring to international law and Tate Letter). Structurally, the FSIA sets forth the general rule that foreign states are immune from the jurisdiction of both federal and state courts in the United States, subject to certain exceptions. 28 U.S.C. §§ 1330(a) & 1604. A federal court lacks subject matter jurisdiction over a claim against a foreign state unless the claim falls within an exception to immunity under the FSIA. *See* 28 U.S.C. § 1330(a); *Verlinden,* 461 U.S. at 489, 103 S.Ct. at 1969; *see also Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 439, 109 S.Ct. 683, 690, 102 L.Ed.2d 818 (1989) (FSIA is "sole basis for obtaining jurisdiction over a foreign state in federal court").

■■■ As a threshold matter, therefore, a court adjudicating a claim against a foreign state must determine whether the FSIA provides subject matter jurisdiction over the claim. *Liu v. Republic of China,* 892 F.2d 1419, 1424 (9th Cir.1989), *cert. dismissed,* — U.S. —, 111 S.Ct. 27, 111 L.Ed.2d 840 (1990). The existence of subject matter jurisdiction under the FSIA is a question of law subject to de novo review. *Id.* Where, as in the present case, a claim has been dismissed for lack of jurisdiction, we accept the allegations of the complaint

as true. *Gerritsen v. de la Madrid Hurtado,* 819 F.2d 1511, 1513 (9th Cir.1987).

The parties and the district court have agreed that the Sidermans' claims fall into two categories: those relating to the expropriation of INOSA and those relating to the torture of Jose Siderman. The district court initially dismissed the expropriation claims on the basis of the act of state doctrine, while awarding a default judgment to the Sidermans on the torture claims. Only later did the court dismiss the torture claims and the Sidermans' entire action. Because the two categories of claims were dismissed at different stages of the suit, and for different reasons, we separately address each category.

## I. EXPROPRIATION CLAIMS

In its order of March 12, 1984, the district court dismissed the expropriation claims on the basis of the act of state doctrine; it did not consider whether it had subject matter jurisdiction over the claims pursuant to the FSIA.[6] The district court erred in deciding the act of state issue without first considering the threshold issue of its subject matter jurisdiction. Because the federal courts lack jurisdiction over a claim against a foreign state that is immune under the FSIA, "[a]t the threshold of every action in a district court against a foreign state, ... the court must satisfy itself that one of the [FSIA] exceptions applies." *Verlinden,* 461 U.S. at 493–94, 103 S.Ct. at 1971. The district court must address this issue "even if the foreign state does not enter an appearance to assert an immunity defense." *Id.* at 494 n. 20, 103 S.Ct. at 1971 n. 20. The court simply cannot proceed without subject matter jurisdiction.

Moreover, the parties neither raised nor briefed the applicability of the FSIA to the expropriation claims before the district court, and nothing in the court's order granting Argentina's motion indicates that it considered the issue. The sole basis for the district court's dismissal of the expropriation claims was the act of state doctrine.

---

**6.** Argentina contends that the district court held that it lacked jurisdiction over the expropriation claims when it later granted Argentina's motion for relief from judgment and dismissed the Sidermans' entire action. We find no evidence in the record to support this contention. At the time that Argentina filed its motion, the district court already had dismissed the expropriation claims. Those claims were no longer at issue.

In contrast to the jurisdictional nature of foreign sovereign immunity under the FSIA, "[t]he act of state doctrine is not a jurisdictional limit on courts." *Liu,* 892 F.2d at 1431. The doctrine reflects the prudential concern that the courts, if they question the validity of sovereign acts taken by foreign states, may be interfering with the conduct of American foreign policy by the Executive and Congress.[7] *W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp.,* 493 U.S. 400, 404, 110 S.Ct. 701, 704, 107 L.Ed.2d 816 (1990); *Liu,* 892 F.2d at 1431. The act of state doctrine is a principle or rule of decision that the courts apply in deciding cases within their jurisdiction. *Environmental Tectonics,* 493 U.S. at 406, 409, 110 S.Ct. at 705, 706–07, *see also West v. Multibanco Comermex, S.A.,* 807 F.2d 820, 827 (9th Cir.) (describing act of state doctrine as "combination justiciability and abstention rule"), *cert. denied,* 482 U.S. 906, 107 S.Ct. 2483, 96 L.Ed.2d 375 (1987). In terms of the Federal Rules of Civil Procedure, the act of state doctrine does not bar an action for lack of subject matter jurisdiction, Fed.R.Civ.P. 12(b)(1), but rather for failure to state a claim upon which relief can be granted, Fed.R.Civ.P. 12(b)(6). *See Timberlane Lumber Co. v. Bank of America, N.T. & S.A.,* 549 F.2d 597, 602 (9th Cir.1976). If a court lacks jurisdiction over a case involving a foreign state, the act of state doctrine never comes into play.[8] "Because sovereign immunity is jurisdictional and the act of state doctrine is not, we must consider sovereign immunity before reaching the act of state doctrine." *De Sanchez v. Banco Central De Nicaragua,* 770 F.2d 1385, 1389 (5th Cir.1985); *see Liu,* 892 F.2d at 1424 (first determining whether subject matter jurisdiction existed under FSIA before addressing district court's act of state ruling).

Since the district court did not consider jurisdiction under the FSIA with regard to the expropriation claims, it made no findings of fact concerning jurisdiction. The record consists of the complaint and numerous declarations submitted by the Sidermans in support of their contention that certain of the FSIA exceptions apply, but includes no pleadings or evidence from Argentina, which had not yet entered an appearance in the case when the expropriation claims were dismissed. Argentina contends that the Sidermans' complaint and declarations fail to demonstrate that the expropriation claims fall within an FSIA exception, and asks us to affirm the district court's dismissal on that ground. We therefore review the record to determine whether the Sidermans have sustained their initial burden of alleging jurisdiction under the FSIA. If the allegations in the Sidermans' complaint, which we must accept as true, and the uncontroverted evidence presented by the Sidermans bring the claims within an FSIA exception, the

---

**7.** The doctrine derives from *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), in which the Court declined to adjudicate the validity of expropriations by the Cuban government. The precise holding of *Sabbatino* was that:

> the Judicial Branch will not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles, even if the complaint alleges that the taking violates customary international law.

*Id.* at 428, 84 S.Ct. at 940; *see also* Restatement (Third) of the Foreign Relations Law of the United States § 443(1) & Comment b (1987). As the numerous qualifications in *Sabbatino's* holding indicate, the act of state doctrine is "supple, flexible, ad hoc." *Republic of the Philippines v. Marcos,* 862 F.2d 1355, 1361 (9th Cir.1988) (en

banc), *cert. denied,* 490 U.S. 1035, 109 S.Ct. 1933, 104 L.Ed.2d 404 (1989).

**8.** We note that in *International Association of Machinists and Aerospace Workers (IAM) v. Organization of Petroleum Exporting Countries (OPEC),* 649 F.2d 1354 (9th Cir.1981), *cert. denied,* 454 U.S. 1163, 102 S.Ct. 1036, 71 L.Ed.2d 319 (1982), a panel of our court applied the act of state doctrine without first resolving the threshold issue of immunity and jurisdiction under the FSIA. However, the *OPEC* decision was rendered prior to the Supreme Court's opinions in both *Verlinden,* which clearly establishes that the question of whether there is jurisdiction under the FSIA must be answered "[a]t the threshold of every action in district court against a foreign state," 461 U.S. at 493–94, 103 S.Ct. at 1971, and *Environmental Tectonics,* which clarified the nature of the act of state doctrine. We therefore address the jurisdictional issue first.

burden then shifts to Argentina to prove that any relevant exceptions do not apply. "Once the plaintiff offers evidence that an FSIA exception to immunity applies, the party claiming immunity bears the burden of proving by a preponderance of the evidence that the exception does not apply." *Schoenberg v. Exportadora de Sal, S.A. de C.V.*, 930 F.2d 777, 779 (9th Cir.1991) (quoting *Joseph v. Office of the Consulate Gen'l of Nigeria,* 830 F.2d 1018, 1021 (9th Cir.1987), *cert. denied,* 485 U.S. 905, 108 S.Ct. 1077, 99 L.Ed.2d 236 (1988)). If the Sidermans successfully have alleged that an exception to immunity under the FSIA applies to their claims, we must remand the claims in order to afford Argentina the opportunity to rebut the Siderman's evidence and sustain its burden of proof before the district court.[9]

The Sidermans argue that two of the FSIA exceptions apply to their expropriation claims, the commercial activity exception, 28 U.S.C. § 1605(a)(2), and the international takings exception, 28 U.S.C. § 1605(a)(3). We consider each in turn.

### A. Commercial Activity Exception

■ The commercial activity exception provides that a foreign state is not immune from jurisdiction where

> the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial

activity of the foreign state elsewhere and that act causes a direct effect in the United States....

28 U.S.C. § 1605(a)(2). As the bracketed numbering indicates, section 1605(a)(2) contains three clauses. *See Schoenberg,* 930 F.2d at 779–80. We find that the Sidermans have presented sufficient allegations and evidence to demonstrate—at least at this stage of the proceedings—that their expropriation claims fall within the first and second clauses and may also fall within the third.

■ In order to come within the first clause of the exception, a claim against a foreign state must be "based upon a commercial activity carried on in the United States by the foreign state." Commercial activity "means either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). In determining whether an act or activity is commercial, we must look to its nature, not its purpose. 28 U.S.C. § 1603(d); *Schoenberg,* 930 F.2d at 780. Though activities that customarily are carried on for profit are certainly commercial, *Schoenberg,* 930 F.2d at 780, an activity need not be motivated by profit to be commercial, *Joseph,* 830 F.2d at 1024. The central question is "whether the activity is of a kind in which a private party might engage." *Id.* In light of the allegations and evidence submitted by the Sidermans, we have no doubt that the Sidermans' claims are based on commercial activity being conducted by Argentina. The activities that form the basis for the claims—Argentina's continuing management of IN-

---

**9.** Although the Sidermans have submitted declarations and evidence beyond the pleadings, allegations in a complaint can themselves be sufficient to require a response from the foreign state defendant before the complaint can be dismissed. In *Meadows v. Dominican Republic,* 817 F.2d 517, 522–23 (9th Cir.), *cert. denied,* 484 U.S. 976, 108 S.Ct. 486, 487, 98 L.Ed.2d 485 (1987), we held that, at least with regard to the commercial activity exception to the FSIA, the district court should observe the following procedure:

> Where, as here, the plaintiff alleges in his complaint that his claim is based on a foreign state's strictly commercial acts, the defendant

must establish a prima facie case that it is a sovereign state and that the plaintiff's claim arises out of a public act. This proof establishes a presumption that the foreign state is protected by immunity. The plaintiff then has the burden of going forward with the evidence by offering proof that one of the FSIA exemptions applies. Once the plaintiff has presented this evidence, the defendant must prove its entitlement to immunity by a preponderance of the evidence.

Thus, even if the Sidermans had presented nothing more than the allegations in their complaint, *Meadows* indicates that it would have been incumbent upon Argentina to respond to those allegations.

OSA, its operation of the Hotel Gran Corona, and its receipt of profits from the company's operations—are clearly activities "of a kind in which a private party might engage." [10]

■ The more difficult question is whether this commercial activity is being "carried on in the United States." 28 U.S.C. § 1605(a)(2). As defined by the FSIA, " 'commercial activity carried on in the United States by a foreign state' means commercial activity carried on by such state and having substantial contact with the United States." 28 U.S.C. § 1603(e). Under this definition, the foreign state need not engage in commercial activity in the United States on a regular basis. *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1018 (2d Cir.1991). Instead, the critical inquiry is whether there is "a nexus between the defendant's commercial activity in the United States and the plaintiff's grievance." *America West Airlines, Inc. v. GPA Group, Ltd.*, 877 F.2d 793, 796 (9th Cir.1989).

The Sidermans have alleged and put forward evidence that Argentina advertises the Hotel Gran Corona in the United States and solicits American guests through its U.S. agent, Aerolinas Argentinas, the national airline of Argentina. They have alleged further that numerous Americans have stayed at the Hotel, which accepts all the major American credit cards, including Mastercard, Visa, and American Express. On the present record, we believe that these allegations are sufficient to demonstrate that the commercial activities Argentina is conducting through INOSA have "substantial contact with the United

States." The Sidermans' allegations also satisfy the nexus requirement established in *America West*. Several of the Sidermans' expropriation claims are directed toward the stream of revenue and benefits that Argentina is receiving through its operation of the Hotel. Argentina's continuing receipt of the profits and benefits that rightfully belong to the Sidermans—including those derived from U.S. sources—are some of the "specific acts that form the basis of the suit." *Id.* at 797 (quoting *Joseph*, 830 F.2d at 1023) (emphasis omitted). We conclude that the Sidermans' allegations and evidence bring their claims within clause one of the commercial activity exception.

■ Clause two of the exception applies to actions based "upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere." 28 U.S.C. § 1605(a)(2). As the few cases to address this clause have noted, it requires a "material connection ... between the plaintiff's cause of action and the *act performed in the United States*." *Stena Rederi AB. v. Comision de Contratos del Comite Ejecutivo General*, 923 F.2d 380, 388 (5th Cir.1991) (emphasis in original). A plaintiff must either demonstrate a causal connection between a sovereign's actions in the United States and those abroad giving rise to the plaintiff's claims, or the sovereign's acts in the United States must themselves represent an element in the plaintiff's cause of action. *Gilson v. Republic of Ireland,* 682 F.2d 1022, 1027 n. 22 (D.C.Cir.1982); *see also* H.R.Rep. No. 1487, 94th Cong., 2d Sess. 19, *reprinted in* 1976 U.S.C.C.A.N. 6613, 6618.

---

**10.** Argentina's initial seizure of INOSA through a "judicial intervention," which the Sidermans allege to have been nothing more than a sham for expropriation, similarly may constitute commercial activity. In *L'Europeenne de Banque v. La Republica de Venezuela*, 700 F.Supp. 114 (S.D.N.Y.1988), a consortium of banks had entered into a deposit lending agreement with a Venezuelan bank, pursuant to which the consortium deposited $30 million. Venezuela subsequently declared an "intervention" in the bank's affairs on the ground that the bank was either in danger of failing or had violated banking laws. Venezuela granted all management powers to a vice president of Venezuela's Deposit

Guaranty and Bank Protection Fund, and eventually the bank was ordered liquidated. In the consortium's subsequent action against Venezuela, the court found that Venezuela's intervention and operation of the bank constituted commercial activity. 700 F.Supp. at 119–20. On the present record, we cannot determine whether a judicial intervention in Argentina is an action that a private party can perform. The Sidermans are free to pursue this argument on remand. We note that the commercial activity exception does not require that *every* act alleged be commercial in nature. *See Foremost–McKesson, Inc. v. Islamic Republic of Iran,* 905 F.2d 438, 450 (D.C.Cir.1990).

The allegations and evidence set forth by the Sidermans that Argentina solicits guests for the Hotel Gran Corona in the United States and presumably accepts payments for those reservations in this country, and that as a result numerous Americans stay at the Hotel, suffice to meet this test. Because of Argentina's acts in the United States—the solicitation and acceptance of reservations—Americans spend money at the Hotel Gran Corona, money which the Sidermans claim rightfully belongs to them. The Sidermans' causes of action for conversion, constructive fraud, intentional interference with business relationships and breach of fiduciary duty directly relate, therefore, to Argentina's acts in this country. Argentina undertakes those acts, furthermore, in connection with commercial activity elsewhere, mainly its operation of the Hotel. The Sidermans' claims thus fall squarely within clause two of the commercial activity exception.

For the Sidermans' expropriation claims to satisfy clause three of the exception, the claims must be based "upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act [must] cause[ ] a direct effect in the United States." 28 U.S.C. § 1605(a)(2). The Sidermans base their claims on Argentina's seizure and continuing operation of INOSA, both of which constitute acts that Argentina has performed outside United States territory. It is equally clear that they have been performed in connection with the commercial activities of operating the Hotel Gran Corona and managing INOSA's real estate investments in Argentina. These activities are, as noted above, "of a kind in which a private party might engage." *Joseph*, 830 F.2d at 1024. The dispositive

element in clause three for purposes of this case, therefore, is the requirement that the acts cause a direct effect in the United States.

Under the direct effect requirement, the "foreign sovereign's activities must cause an effect in the United States that is substantial and foreseeable in order to abrogate sovereign immunity." *America West*, 877 F.2d at 799. For example, in *America West*, an American airline sued an Irish national airline for damage sustained by an aircraft engine on which the Irish airline had performed faulty maintenance work. Finding that it was not foreseeable that the maintenance work performed in Ireland on an engine then owned by a Netherlands Antilles company would have an effect in the United States, we held that the direct effect requirement was unsatisfied. *Id.* at 800. The "purely fortuitous" fact that the plaintiff whose plane subsequently was fitted out with the engine was an American corporation was insufficient to create a direct effect. *Id.; see also Security Pacific Nat'l Bank v. Derderian*, 872 F.2d 281, 286 (9th Cir.1989); *Martin v. Republic of S. Africa*, 836 F.2d 91, 94–95 (2d Cir.1987) (finding no direct effect in United States where African–American was denied medical treatment in South Africa).

As a general matter, therefore, "[m]ere financial loss" suffered by a person, whether individual or corporate, in the United States is not, in itself, sufficient to constitute a "direct effect." *America West*, 877 F.2d at 799–800. However, in cases where a plaintiff's claim is for breach of a contract providing that payment or performance must be made in the United States, the "direct effect" requirement has been deemed satisfied.[11] For example, in

11. These cases reflect the general rule that "a direct effect occurs at the locus of the injury directly resulting from the sovereign defendant's wrongful acts." Restatement (Third) of the Foreign Relations Law of the United States § 453 Reporter's Note 5 (1987). Thus, two Ninth Circuit cases cited by Argentina have held that the estate or family of a decedent who died abroad could not establish the required direct effect, because their injuries were only indirectly related to the direct injury suffered by the decedent. *See Australian Gov't Aircraft Facto-*

*ries v. Lynne,* 743 F.2d 672, 674–75 (9th Cir. 1984), *cert. denied,* 469 U.S. 1214, 105 S.Ct. 1189, 84 L.Ed.2d 335 (1985) (American pilot died when plane crashed in Indonesia); *Berkovitz v. Islamic Republic of Iran,* 735 F.2d 329, 332 (9th Cir.), *cert. denied,* 469 U.S. 1035, 105 S.Ct. 510, 83 L.Ed.2d 401 (1984) (American killed by revolutionary forces in Iran). These cases are distinguishable from the Sidermans' action, which asserts direct injuries to the Sidermans as the owners and shareholders of INOSA.

*Meadows v. Dominican Republic,* 817 F.2d 517 (9th Cir.1987), we considered an action brought by two U.S. residents to recover a loan commission they earned by obtaining a loan on behalf of a foreign government. Under the loan agreement, the commission was to be paid in the United States— through the plaintiffs' bank—and we found this to be a sufficiently direct effect to permit jurisdiction under clause three. 817 F.2d at 523. *See also Gregorian v. Izvestia,* 871 F.2d 1515, 1527 (9th Cir.1989) (discussing similar cases); *L'Europeenne de Banque v. La Republica de Venezuela,* 700 F.Supp. 114, 121 (S.D.N.Y.1988) (extending rule to encompass foreign plaintiff).

▮ As an owner and shareholder of INOSA, each of the Sidermans is entitled to a share of the profits earned by the corporation. If INOSA's articles of incorporation or by-laws (or the equivalent corporate documents under Argentine law) require INOSA to pay those dividends at the shareholder's place of residence, the United States, we believe in light of *Meadows* that the direct effect requirement would be satisfied. While the record before us does not reveal whether this is the case, it would be premature to hold that the Sidermans have failed to establish a direct effect. Since the Sidermans have alleged jurisdiction under clauses one and two, and we are remanding the expropriation claims on those grounds, on remand the Sidermans also may pursue jurisdiction under clause three and seek to cure any jurisdictional defects by amending their complaint or submitting additional evidence. *See Trentacosta v. Frontier Pac. Aircraft Indus.,* 813 F.2d 1553, 1561–62 (9th Cir.1987); *In re Complaint of McLinn,* 744 F.2d 677, 685 (9th Cir.1984).

*B. International Takings Exception*

▮ The Sidermans argue that their claims also fall within the international takings exception to the FSIA's rule of immunity. That exception provides that a foreign state is not immune in an action

in which rights in property taken in violation of international law are in issue and

▮ that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or [2] that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States....

28 U.S.C. § 1605(a)(3). Though few courts have had the opportunity to consider the international takings exception, it is clear that Jose, Lea, and Carlos Siderman cannot assert a claim that comes within this exception. In *Chuidian v. Philippine Nat'l Bank,* 912 F.2d 1095, 1105 (9th Cir.1990), we held that the exception does not apply where the plaintiff is a citizen of the defendant country at the time of the expropriation, because "[e]xpropriation by a sovereign state of the property of its own nationals does not implicate settled principles of international law." *See also De Sanchez v. Banco Central de Nicaragua,* 770 F.2d 1385, 1395 (5th Cir.1985). However, Susana Siderman de Blake is eligible to invoke the international takings exception, and the Sidermans' allegations and evidence bring her claims within clause two of that exception.

▮ Under that clause, the property at issue must have been taken in violation of international law. At the jurisdictional stage, we need not decide whether the taking actually violated international law; as long as a "claim is substantial and nonfrivolous, it provides a sufficient basis for the exercise of our jurisdiction." *West v. Multibanco Comermex, S.A.,* 807 F.2d 820, 826 (9th Cir.), *cert. denied,* 482 U.S. 906, 107 S.Ct. 2483, 96 L.Ed.2d 375 (1987). In *West,* we described three requisites under international law for a valid taking. First, "[v]alid expropriations must always serve a public purpose." 807 F.2d at 831. Second, "aliens [must] not be discriminated against or singled out for regulation by the state." *Id.* at 832. Finally, "[a]n otherwise valid taking is illegal without the payment of just compensation." *Id.* These well-estab-

lished principles track the Restatement of Foreign Relations Law, which provides:

A state is responsible under international law for injury resulting from:

(1) a taking by the state of the property of a national of another state that

(a) is not for a public purpose, or

(b) is discriminatory, or

(c) is not accompanied by provision for just compensation....

Restatement (Third) of the Foreign Relations Law of the United States § 712 (1987) [hereinafter "Restatement"]. The legislative history of the FSIA reveals a similar understanding of what constitutes a taking in violation of international law. *See* H.R.Rep. No. 1487, 94th Cong., 2d Sess. 19–20, *reprinted in* 1976 U.S.Code Cong. & Admin.News 6604, 6618 (taking violates international law if it is done "without payment of the prompt adequate and effective compensation required by international law" or is "arbitrary or discriminatory in nature"). If a taking violates any one of the aforementioned proscriptions, it violates international law.

Susana Siderman de Blake's claim that Argentina violated the international law of expropriation is substantial and non-frivolous. The complaint alleges that Argentina officials seized INOSA for their personal profit and not for any public purpose. The complaint also alleges that Argentina seized INOSA because the Siderman family is Jewish—a discriminatory motivation based on ethnicity. *See* Restatement § 712 Comment f (noting that "taking that singles out aliens generally, or aliens of a particular nationality, or particular aliens, would violate international law"). Finally, none of the Sidermans has received *any* compensation for the seizure, let alone just compensation. As in *West,* we have no difficulty concluding that the Sidermans' complaint contains "substantial and non-frivolous" allegations that INOSA was taken in violation of international law.

■ Beyond establishing that property has been taken in violation of international law, Susan Siderman de Blake must demonstrate that the expropriated property, or property exchanged for it, is owned or op-

erated by an agency or instrumentality of Argentina and that the agency or instrumentality is engaged in commercial activity in the United States. The Sidermans' allegations establish that INOSA itself has become an agency or instrumentality of Argentina. As defined by the FSIA, an "agency or instrumentality"

means any entity—

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, ... and

(3) which is neither a citizen of a State of the United States ... nor created under the laws of any third country.

28 U.S.C. § 1603(b). As an Argentine corporation, INOSA satisfies the first and third elements of the above definition, and the Sidermans' basic allegation that Argentina has expropriated INOSA suffices as an allegation that INOSA is now an "organ" of Argentina or Tucuman. The Sidermans' allegations thus satisfy the "agency or instrumentality" definition. The final requirement under clause two—that the agency or instrumentality must be engaged in a commercial activity in the United States—is also met. The Sidermans' allegations concerning Argentina's solicitation and entertainment of American guests at the Hotel Gran Corona and the hotel's acceptance of American credit cards and traveler's checks are sufficient at this stage of the proceedings to show that Argentina is engaged in a commercial activity in the United States. The Sidermans' allegations bring Susana Siderman de Blake's expropriation claims within clause two of the international takings exception.

■ We hold that the Sidermans' complaint and declarations allege sufficient facts to bring their expropriation claims within both the commercial activity and international takings exceptions to the FSIA's grant of foreign sovereign immunity. We emphasize the preliminary nature of our holding; following further development of the factual record on remand, the district court ultimately must determine whether the FSIA exceptions do or do not apply to the expropriation claims. While

the Sidermans have sustained their initial burden of alleging applicable exceptions to the FSIA, Argentina will have the opportunity on remand to challenge the evidence presented by the Sidermans and to present its own. Under the procedures our circuit has developed for considering jurisdiction under the FSIA, Argentina now bears the burden of proving by a preponderance of the evidence that none of the FSIA exceptions applies to the Sidermans' claims. *Schoenberg*, 930 F.2d at 779. To the extent that the jurisdictional facts are disputed on remand, the parties should be allowed to conduct discovery for the limited purpose of establishing jurisdictional facts before the claims can be dismissed. *See America West*, 877 F.2d at 801 ("[W]here pertinent facts bearing on the question of jurisdiction are in dispute, discovery should be allowed."); *see also Santos v. Compagnie Nationale Air France*, 934 F.2d 890, 892 n. 2 (7th Cir.1991); *Filus v. LOT Polish Airlines*, 907 F.2d 1328, 1332 (2d Cir.1990).

▄▄▄ Because we are remanding to the district court for a more complete investigation of the jurisdictional basis for the Sidermans' expropriation claims, we vacate the district court's judgment dismissing those claims on the basis of the act of state doctrine. If the district court determines that it does have jurisdiction over the expropriation claims, Argentina can raise, and the district court can reconsider, the act of state doctrine as a defense to those claims. The district court erred in applying that doctrine before Argentina had even entered an appearance in the case. "The burden of proving acts of state rests on the party asserting the applicability of the doctrine." *Liu*, 892 F.2d at 1432; *see also Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1361 (9th Cir.1988) (en banc), *cert. denied*, 490 U.S. 1035, 109 S.Ct. 1933, 104 L.Ed.2d 404 (1989). "At a minimum, this burden requires that a party offer some evidence that the government acted in its sovereign capacity and some indication of the depth and nature of the government's interest." *Liu*, 892 F.2d at 1432. Because the district court acted *sua sponte* in dismissing the expropriation claims, Argentina has offered no such evidence of an act of state.[12]

## II. TORTURE CLAIMS

The question of Argentina's immunity from the Sidermans' torture claims is squarely presented, without the procedural complications surrounding the district court's treatment of the expropriation claims. The district court dismissed the torture claims on the ground that they fell within no exception to immunity under the FSIA.[13] In defending the district court's decision on appeal, Argentina argues that the Sidermans' claims are foreclosed by the Supreme Court's opinion in *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989). Since *Amerada Hess* represents the Court's most extensive treatment of the FSIA and its exceptions to immunity, we begin with a discussion of the case

---

12. We also note that since the time of the district court's ruling, both the Supreme Court and our circuit have provided more extensive guidance on the factors the district court should consider in deciding whether it is appropriate to apply the act of state doctrine in a given case. *See, e.g., W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp.*, 493 U.S. 400, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990); *Liu*, 892 F.2d at 1431–34; *Marcos*, 862 F.2d at 1360–61.

13. When the district court granted the initial default judgment in favor of Jose and Lea Siderman on the torture claims, it relied on the Alien Tort Statute, which provides the federal courts with jurisdiction over "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. When the district

court later granted Argentina's motion for relief from the default judgment, it held that the Alien Tort Statute did not provide an exception to foreign sovereign immunity and that no exception in the FSIA encompassed the Sidermans' torture claims. The Supreme Court since has held that the Alien Tort Statute does not provide jurisdiction over suits against foreign states; the FSIA is the sole basis for jurisdiction over such actions. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434–38, 109 S.Ct. 683, 687–90, 102 L.Ed.2d 818 (1989). In light of *Amerada Hess*, and because the FSIA links immunity to subject matter jurisdiction, the district court's determination that no FSIA exception applied to the torture claims necessarily constituted a determination that the court lacked subject matter jurisdiction.

before turning to the Sidermans' arguments about why the case does not preclude their torture claims.

*Amerada Hess* involved a Liberian oil tanker that was attacked by Argentine military aircraft during the Falklands/Malvinas War between Great Britain and Argentina. The tanker's owner and its charterer each brought suit against Argentina, but the district court dismissed their actions for lack of subject matter jurisdiction under the FSIA. The court of appeals reversed, finding that subject matter jurisdiction existed under the Alien Tort Statute. The Supreme Court, reversing the court of appeals, held that the FSIA provides "the sole basis for obtaining jurisdiction over a foreign state in our courts," 488 U.S. at 434, 109 S.Ct. at 688, and found that none of the exceptions to the general FSIA rule of immunity encompassed the plaintiffs' claims. *Id.* at 439, 109 S.Ct. at 690.

In *Amerada Hess*, the plaintiffs relied primarily on the noncommercial tort exception to the FSIA's grant of immunity. That exception eliminates immunity in cases

> in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment....

28 U.S.C. § 1605(a)(5). The Court, limiting this exception to cases in which the damage to or loss of property occurred within the territorial jurisdiction of the United States, held that it did not encompass the plaintiffs' claims. 488 U.S. at 439–41, 109 S.Ct. at 690–91. Argentina has devoted the bulk of its argument in the present case to a discussion of the noncommercial tort exception and *Amerada Hess*'s holding that the exception does not encompass tortious activity perpetrated outside the territorial jurisdiction of the United States. If the

Sidermans were relying on section 1605(a)(5), their claims clearly would be barred under *Amerada Hess*. However, none of the three arguments they raise rests on that exception. Instead, the Sidermans contend that Argentina is precluded from asserting the defense of sovereign immunity by the international law principle of *jus cogens*, and by the FSIA's existing treaty (section 1604) and implied waiver (section 1605(a)(1)) exceptions. We consider each of these arguments in turn.

### A. Jus Cogens

The Sidermans contend that Argentina does not enjoy sovereign immunity with respect to its violation of the *jus cogens* norm of international law condemning official torture.[14] While we agree with the Sidermans that official acts of torture of the sort they allege Argentina to have committed constitute a *jus cogens* violation, we conclude that *Amerada Hess* forecloses their attempt to posit a basis for jurisdiction not expressly countenanced by the FSIA.

As defined in the Vienna Convention on the Law of Treaties, a *jus cogens* norm, also known as a "peremptory norm" of international law, "is a norm accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character." Vienna Convention on the Law of Treaties, art. 53, May 23, 1969, 1155 U.N.T.S. 332, 8 I.L.M. 679 [hereinafter "Vienna Convention"]; *see also* Restatement § 102 Reporter's Note 6. *Jus cogens* is related to customary international law (the direct descendant of the law of nations), which the Restatement defines as the "general and consistent practice of states followed by them from a sense of legal obligation." Restatement § 102(2). Courts ascertain customary international law "by consulting the works of jurists, writing professedly on public law; or by the general usage and practice of nations;

---

**14.** The term "official torture" is intended to encompass acts of torture performed by or under the direction of government officials.

or by judicial decisions recognizing and enforcing that law." *United States v. Smith*, 18 U.S. (5 Wheat.) 153, 160–61, 5 L.Ed. 57 (1820) (Story, J.); *see also The Paquete Habana*, 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44 L.Ed. 320 (1900) (in ascertaining and administering customary international law, courts should resort "to the customs and usages of civilized nations, and, as evidence of these, to the works of jurists and commentators"); *Filartiga v. Pena–Irala*, 630 F.2d 876, 880–81 (2d Cir. 1980). Courts seeking to determine whether a norm of customary international law has attained the status of *jus cogens* look to the same sources, but must also determine whether the international community recognizes the norm as one "from which no derogation is permitted." *Committee of U.S. Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 940 (D.C.Cir.1988) [hereinafter "*CUSCLIN*"] (quoting Vienna Convention, art. 53). In *CUSCLIN*, the only reported federal decision to give extended treatment to *jus cogens*, the court described *jus cogens* as an elite subset of the norms recognized as customary international law. *Id.*

While *jus cogens* and customary international law are related, they differ in one important respect. Customary international law, like international law defined by treaties and other international agreements, rests on the consent of states. A state that persistently objects to a norm of customary international law that other states accept is not bound by that norm, *see* Restatement § 102 Comment d, just as a state that is not party to an international agreement is not bound by the terms of that agreement. International agreements and customary international law create norms known as *jus dispositivum*, the category of international law that "consists of norms derived from the consent of states" and that is founded "on the self-interest of the participating states." Klein, *A Theory for the Application of the Customary International Law of Human Rights by Domestic Courts*, 13 Yale J. Int'l L. 332, 351 (1988) [hereinafter "*Human Rights in Domestic Courts*"]. *Jus dispositivum* binds only "those states consenting to be governed by it." *Id.*

In contrast, *jus cogens* "embraces customary laws considered binding on all nations," *id.* at 350–51, and "is derived from values taken to be fundamental by the international community, rather than from the fortuitous or self-interested choices of nations," *id.* at 351. Whereas customary international law derives solely from the consent of states, the fundamental and universal norms constituting *jus cogens* transcend such consent, as exemplified by the theories underlying the judgments of the Nuremberg tribunals following World War II. *See* Note, *The Nuremberg Legacy: An Unfulfilled Promise*, 63 S.Cal.L.Rev. 833, 868 (1990) [hereinafter "*Nuremberg Legacy*"]; Belsky, Merva & Roht–Arriaza, *Implied Waiver Under the FSIA: A Proposed Exception to Immunity for Violations of Peremptory Norms of International Law*, 77 Calif.L.Rev. 365, 385–86 (1989) [hereinafter "*Implied Waiver*"]. The legitimacy of the Nuremberg prosecutions rested not on the consent of the Axis Powers and individual defendants, but on the nature of the acts they committed: acts that the laws of all civilized nations define as criminal. *See Nuremberg Legacy, supra*, at 862–67. The universal and fundamental rights of human beings identified by Nuremberg—rights against genocide, enslavement, and other inhumane acts, *see id.* at 847 (discussing Nuremberg Charter)—are the direct ancestors of the universal and fundamental norms recognized as *jus cogens*. In the words of the International Court of Justice, these norms, which include "principles and rules concerning the basic rights of the human person," are the concern of all states; "they are obligations *erga omnes.*" *The Barcelona Traction, Light & Power Co. (Belgium v. Spain)*, 1970 I.C.J. 3, 32.

Because *jus cogens* norms do not depend solely on the consent of states for their binding force, they "enjoy the highest status within international law." *CUSCLIN*, 859 F.2d at 940. For example, a treaty that contravenes *jus cogens* is considered under international law to be void

*ab initio.* *See* Vienna Convention, art. 53; Restatement § 102 Comment k. Indeed, the supremacy of *jus cogens* extends over all rules of international law; norms that have attained the status of *jus cogens* "prevail over and invalidate international agreements and other rules of international law in conflict with them." Restatement § 102 Comment k. A *jus cogens* norm is subject to modification or derogation only by a subsequent *jus cogens* norm. *Id.*

 The Sidermans claim that the prohibition against official torture has attained the status of a *jus cogens* norm. There is no doubt that the prohibition against official torture is a norm of customary international law, as the Second Circuit recognized more than ten years ago in the landmark case of *Filartiga v. Pena–Irala,* 630 F.2d 876 (2d Cir.1980). Dr. Filartiga and his daughter, citizens of Paraguay, brought suit against Paraguayan officials who had tortured Dr. Filartiga's son to death. They alleged jurisdiction under the Alien Tort Statute, which grants the district courts "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. Dr. Filartiga claimed that the defendants' torture of his son, perpetrated under color of official authority, violated a norm of customary international law prohibiting official torture, and the court agreed. Judge Kaufman, writing for the court, explained that "there are few, if any, issues in international law today on which opinion seems to be so united as the limitations on a state's power to torture persons held in its custody." 630 F.2d at 881. Judge Kaufman catalogued the evidence in support of this view, citing several declarations of the United Nations General Assembly and human rights conventions prohibiting torture,[15] modern municipal law to the same effect, and the works of jurists, and finally

concluded "that official torture is now prohibited by the law of nations." *Id.* at 884.

Other authorities have also recognized that official torture is prohibited by customary international law. In *Forti v. Suarez–Mason,* 672 F.Supp. 1531, 1541 (N.D.Cal.1987), a suit predicated on atrocities committed by the same Argentine military government alleged to be responsible for the torture of Jose Siderman, the district court held that "official torture constitutes a cognizable violation of the law of nations," and described the prohibition against official torture as "universal, obligatory, and definable." Similarly, in *Tel–Oren v. Libyan Arab Republic,* 726 F.2d 774, 781 (D.C.Cir.1984) (opinion of Edwards, J.), *cert. denied,* 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985), which involved an action against the Palestine Liberation Organization for its acts of terrorism, Judge Edwards identified torture as a violation of customary international law. Judge Bork, although raising considerable opposition to the application of customary international law in U.S. courts, *see id.* at 801–19 (opinion of Bork, J.), at the same time conceded that the international law prohibition against torture is not disputed. *Id.* at 820. The Restatement of Foreign Relations also holds to the view that customary international law prohibits official torture. Restatement § 702(d). Finally, the world now has an international agreement focused specifically on the prohibition against torture: The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, 39 U.N. GAOR Supp. (No. 51), 23 I.L.M. 1027 (1984) [hereinafter "Torture Convention"], which entered into force on June 26, 1987. The United States signed the Torture Convention in April 1988, the United States Senate gave its advice and consent in October 1988, *see* 136 Cong.Rec. S17486–92 (dai-

---

**15.** Judge Kaufman cited the Universal Declaration of Human Rights, G.A. Res. 217A(III), 3 U.N. GAOR Supp. (No. 16), U.N. Doc. A/810 (1948); Declaration on the Protection of All Persons from Being Subjected to Torture, G.A. Res. 3452, 30 U.N. GAOR Supp. (No. 34) at 91, U.N. Doc. A/1034 (1975); American Convention on Human Rights, Nov. 22, 1969, 36 O.A.S.T.S. 1, O.A.S. Official Records OEA/Ser. 4 v/II 23, doc 21, rev. 2 (1975); International Covenant on Civil and Political Rights, Annex to G.A. Res. 2200(XXI)a, 21 U.N. GAOR Supp. (No. 16), U.N. Doc. A/6316 (1966); European Convention for the Protection of Human Rights and Fundamental Freedoms, Art. 3, Council of Europe, Europ. T.S. No. 5, 213 U.N.T.S. 211 (1968).

ly ed. October 27, 1990), and it now awaits the President's filing of the instrument of ratification with the Secretary–General of the United Nations.[16]

In light of the unanimous view of these authoritative voices, it would be unthinkable to conclude other than that acts of official torture violate customary international law. And while not all customary international law carries with it the force of a *jus cogens* norm, the prohibition against official torture has attained that status. In *CUSCLIN*, 859 F.2d at 941–42, the D.C. Circuit announced that torture is one of a handful of acts that constitute violations of *jus cogens*. In *Filartiga*, though the court was not explicitly considering *jus cogens*, Judge Kaufman's survey of the universal condemnation of torture provides much support for the view that torture violates *jus cogens*. In Judge Kaufman's words, "[a]mong the rights universally proclaimed by all nations, as we have noted, is the right to be free of physical torture." 630 F.2d at 890. Supporting this case law is the Restatement, which recognizes the prohibition against official torture as one of only a few *jus cogens* norms. Restatement § 702 Comment n (also identifying *jus cogens* norms prohibiting genocide, slavery, murder or causing disappearance of individuals, prolonged arbitrary detention, and systematic racial discrimination). Finally, there is widespread agreement among scholars that the prohibition against official torture has achieved the status of a *jus cogens* norm. *See, e.g., Implied Waiver, supra,* at 389, 393–94; Parker & Neylon, *Jus Cogens: Compelling the Law of Human Rights,* 12 Hastings

Int'l & Comp.L.Rev. 411, 437–39 (1989); *Human Rights in Domestic Courts, supra,* at 354 n. 111; Randall, *Universal Jurisdiction Under International Law,* 66 Tex.L.Rev. 785, 830 (1988).

Given this extraordinary consensus, we conclude that the right to be free from official torture is fundamental and universal, a right deserving of the highest status under international law, a norm of *jus cogens.* The crack of the whip, the clamp of the thumb screw, the crush of the iron maiden, and, in these more efficient modern times, the shock of the electric cattle prod are forms of torture that the international order will not tolerate. To subject a person to such horrors is to commit one of the most egregious violations of the personal security and dignity of a human being. That states engage in official torture cannot be doubted, but all states believe it is wrong, all that engage in torture deny it, and no state claims a sovereign right to torture its own citizens. *See Filartiga,* 630 F.2d at 884 (noting that no contemporary state asserts "a right to torture its own or another nation's citizens"); *id.* at n. 15 ("The fact that the prohibition against torture is often honored in the breach does not diminish its binding effect as a norm of international law."). Under international law, any state that engages in official torture violates *jus cogens.*

The question in the present case is what flows from the Sidermans' allegation that Argentina tortured Jose Siderman and thereby violated a *jus cogens* norm. The Sidermans contend that when a foreign

---

**16.** The Torture Convention defines torture as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. Torture Convention, art. 1. The agreement also calls on each state party to take measures to prevent torture within its territory, *id.,* art. 2, and to "ensure that all acts of torture are offenses under its criminal law," *id.,* art. 4. States parties must either prosecute or extradite persons charged with torture. *Id.,* arts. 5–8. Each state party also must ensure that torture victims or their decedents "obtain[ ] redress and ha[ve] an enforceable right to fair and adequate compensation including the means for as full rehabilitation as possible." *Id.,* art. 14(1). Finally, the Torture Convention creates a "Committee against Torture," which is responsible for receiving and reviewing states' compliance with the agreement. *Id.,* arts. 17–24.

state's act violates *jus cogens,* the state is not entitled to sovereign immunity with respect to that act. This argument begins from the principle that *jus cogens* norms "enjoy the highest status within international law," *CUSCLIN,* 859 F.2d at 940, and thus "prevail over and invalidate ... other rules of international law in conflict with them," Restatement § 102 Comment k. The Sidermans argue that since sovereign immunity itself is a principle of international law, it is trumped by *jus cogens.* In short, they argue that when a state violates *jus cogens,* the cloak of immunity provided by international law falls away, leaving the state amenable to suit.

As a matter of international law, the Sidermans' argument carries much force. We previously have recognized that "[s]overeign immunity is a principle of international law." *International Ass'n of Machinists & Aerospace Workers (IAM) v. Organization of Petroleum Exporting Countries (OPEC),* 649 F.2d 1354, 1359 (9th Cir.1981), *cert. denied,* 454 U.S. 1163, 102 S.Ct. 1036, 71 L.Ed.2d 319 (1982). Chief Justice Marshall identified the foundation of the doctrine of sovereign immunity as the "perfect equality and absolute independence of sovereigns," a state of affairs making it improper for one state to subject another to its jurisdiction. *The Schooner Exchange,* 11 U.S. (7 Cranch) at 137. As described by one scholar of international law, the doctrine of foreign sovereign immunity "is rooted in two bases of international law, the notion of sovereignty and the notion of the equality of sovereigns." Riesenfeld, *Sovereign Immunity in Perspective,* 19 Vand. J. Transnat'l L. 1 (1986). When Jack Tate, writing on behalf of the State Department, issued his famous letter in 1952, the United States was recognizing the trend in international law toward adoption of the restrictive principle of foreign sovereign immunity, under which states receive immunity for their sovereign acts (*jure imperii*) but not their private acts (*jure gestionis*). With the enactment of the FSIA, Congress explicitly adopted the restrictive principle, identifying its origin in international law. 28 U.S.C. § 1602 (findings and declaration of purpose); *see*

*also* H.R.Rep. No. 1487, 94th Cong., 2d Sess. 7, *reprinted in* 1976 U.S.Code Cong. & Admin.News 6604, 6605 (FSIA "would codify the so-called 'restrictive' principle of sovereign immunity, as presently recognized in international law"); *id.* at 8, 1976 U.S.Code Cong. & Admin.News at 6606 ("Sovereign immunity is a doctrine of international law under which domestic courts, in appropriate cases, relinquish jurisdiction over a foreign state."); *id.* at 9, 1976 U.S.Code Cong. & Admin.News at 6608 ("[S]overeign immunity is a question of international law to be determined by the courts.").

The Sidermans posit that because sovereign immunity derives from international law, *jus cogens* supersedes it. "*Jus cogens* norms represent the fundamental duties incident to international life. They are an essential component of the modern law definition of sovereignty." *Implied Waiver, supra,* at 392. International law does not recognize an act that violates *jus cogens* as a sovereign act. A state's violation of the *jus cogens* norm prohibiting official torture therefore would not be entitled to the immunity afforded by international law.

Unfortunately, we do not write on a clean slate. We deal not only with customary international law, but with an affirmative Act of Congress, the FSIA. We must interpret the FSIA through the prism of *Amerada Hess.* Nothing in the text or legislative history of the FSIA explicitly addresses the effect violations of *jus cogens* might have on the FSIA's cloak of immunity. Argentina contends that the Supreme Court's statement in *Amerada Hess* that the FSIA grants immunity "in those cases involving alleged violations of international law that do not come within one of the FSIA's exceptions," 488 U.S. at 436, 109 S.Ct. at 688, precludes the Sidermans' reliance on *jus cogens* in this case. Clearly, the FSIA does not specifically provide for an exception to sovereign immunity based on *jus cogens.* In *Amerada Hess,* the Court had no occasion to consider acts of torture or other violations of the peremptory norms of international law, and such violations admittedly differ in kind

from transgressions of *jus dispositivum*, the norms derived from international agreements or customary international law with which the *Amerada Hess* Court dealt. However, the Court was so emphatic in its pronouncement "that immunity is granted in those cases involving alleged violations of international law that do not come within one of the FSIA's exceptions," *Amerada Hess*, 488 U.S. at 436, 109 S.Ct. at 688, and so specific in its formulation and method of approach, *id.* at 439, 109 S.Ct. at 690 ("Having determined that the FSIA provides the sole basis for obtaining jurisdiction over a foreign state in federal court, we turn to whether any of the exceptions enumerated in the Act apply here"), that we conclude that if violations of *jus cogens* committed outside the United States are to be exceptions to immunity, Congress must make them so. The fact that there has been a violation of *jus cogens* does not confer jurisdiction under the FSIA.

### B. Existing Treaty Exception

The FSIA section establishing the general rule of foreign sovereign immunity in United States courts, 28 U.S.C. § 1604, provides that the rule of immunity is "[s]ubject to existing international agreements to which the United States is a party at the time of enactment of" the FSIA. In *Amerada Hess*, the plaintiffs argued that Argentina's immunity was subject to the Geneva Convention on the High Seas and the Pan American Maritime Neutrality Convention and that those treaties created an exception to FSIA immunity under section 1604. The Court rejected the argument, adopting a narrow view of section 1604:

> This exception applies when international agreements expressly conflict with the immunity provisions of the FSIA, hardly the circumstances in this case. [The Geneva and Pan American Conventions] only set forth substantive rules of conduct and state that compensation shall be paid for certain wrongs. They do not create private rights of action for foreign corporations to recover compensation from foreign states in United States courts.

488 U.S. at 442, 109 S.Ct. at 692 (internal quotations, alterations, and citations omitted). Thus, the Court erected a serious obstacle to claims that, by subscribing to a treaty or other international agreement, a defendant state loses its immunity under the FSIA.

The Sidermans argue that Argentina's immunity under the FSIA is "subject to" the Universal Declaration of Human Rights, G.A. Res. 217A(III), U.N. Doc. A/810 (1948), and the United Nations Charter. Neither of these documents can support the weight the Sidermans place on them. The Universal Declaration of Human Rights is a resolution of the General Assembly of the United Nations. As such, it is a powerful and authoritative statement of the customary international law of human rights. *See Filartiga v. Pena–Irala*, 630 F.2d 876, 882–84 (2d Cir.1980). However, it is not an "international agreement" within the meaning of section 1604. While the meaning of that term may not be restricted to treaties that the United States has ratified pursuant to Article II, Section 2 of the Constitution, *see* Restatement, Intro. Note to Part III, at 146, the legislative history of the FSIA reveals that Congress intended the FSIA to be subject to enforceable agreements between the United States and other foreign states or international organizations. The House Report refers to several examples of "international agreements," including the NATO Status of Forces Agreement, and treaties of friendship, commerce and navigation. H.R.Rep. No. 1487, 94th Cong., 2d Sess. 17–18, *reprinted in* 1976 U.S.Code Cong. & Admin.News 6604, 6616. These international agreements, which are intended by the parties to be legally binding under international law, are categorically different from the Universal Declaration of Human Rights, which creates legal obligations only insofar as it represents evidence of customary international law. We see no indication in the FSIA or its legislative history that Congress intended the term "international agreements" to include non-binding resolutions of the General Assembly of the United Nations.

■ The United Nations Charter, in contrast to the Universal Declaration, is a treaty of the United States. However, the Sidermans have been unable to point out any language in the Charter regarding individual remedies or compensation for violations of its substantive rules of conduct. In contrast, the treaties that were at issue in *Amerada Hess* were quite specific about the rights to compensation of merchant ships in time of war. *See Amerada Hess*, 488 U.S. at 442 n. 10, 109 S.Ct. at 692 n. 10. For example, the Pan American Maritime Neutrality Convention provides that belligerents must indemnify any damage they cause to neutral merchant ships. *Id.* Despite these specific remedial provisions, the Court was unwilling to hold that the treaties expressly conflicted with the immunity created by the FSIA, and thus found section 1604 inapplicable. We cannot, consistently with *Amerada Hess*, accept the Sidermans' argument that the U.N. Charter expressly conflicts with the FSIA when the Charter does not even discuss compensation or individual remedies.

We hold that the Sidermans have failed to identify an international agreement to which the United States is a party that "expressly conflict[s] with the immunity provisions of the FSIA." *Amerada Hess*, 488 U.S. at 442, 109 S.Ct. at 692. The existing treaty exception of section 1604 does not apply to the torture claims.

### C. Implied Waiver Exception

■ The FSIA provides that "[a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case ... in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver." 28 U.S.C. § 1605(a)(1). The Sidermans contend that Argentina availed itself of our courts in its pursuit of Jose Siderman and, in doing so, implicitly waived its immunity defense with respect to their claims for torture and persecution. They assert that after the elder Siderman fled to this country, Argentina commenced malicious criminal proceedings against him in Argentina, and requested the assistance of the California state courts in obtaining jurisdiction over his person. The California courts, unaware of Argentina's true intentions, complied by effecting service of process.

Argentina did not controvert the Sidermans' implicit waiver argument in the district court.[17] As is true with respect to the commercial activity and international takings clauses on which the Sidermans base jurisdiction for their expropriation claims, then, the only material before us on the subject of waiver is that presented by the Sidermans. We conclude that their allegations and evidence suffice to bring their claims for torture within section 1605(a)(1) of the FSIA. On remand, Argentina will have an opportunity to rebut the Sidermans' evidence. At this stage of the proceedings, however, we are unable to say that the Sidermans' arguments as to implied waiver are devoid of merit.

The FSIA's waiver exception "is narrowly construed." *Joseph v. Office of Consulate General of Nigeria*, 830 F.2d 1018, 1022 (9th Cir.1987), *cert. denied*, 485 U.S.

---

17. Argentina's sole contention below with respect to the Sidermans' torture claims was that the FSIA's noncommercial tort exception, section 1605(a)(5), precludes an immunity defense only in cases where a sovereign has engaged in tortious activity within the territorial jurisdiction of the United States. We so held in *McKeel v. Islamic Republic of Iran*, 722 F.2d 582 (9th Cir.1983), *cert. denied*, 469 U.S. 880, 105 S.Ct. 243, 83 L.Ed.2d 182 (1984), where we stated that "nothing in the legislative history [of section 1605(a)(5)] suggests that Congress intended to assert jurisdiction over foreign states for events occurring wholly within their own territory."

*Id.* at 588; *see also Berkovitz v. Islamic Republic of Iran*, 735 F.2d 329, 331 (9th Cir.1984), *cert. denied*, 469 U.S. 1035, 105 S.Ct. 510, 83 L.Ed.2d 401 (1984) ("Subsection (a)(5) requires 'personal injury, or death ... occurring in the United States ...'"). The Supreme Court confirmed our position in *Amerada Hess*. 488 U.S. at 439, 109 S.Ct. at 690 ("Section 1605(a)(5) is limited by its terms ... to those cases in which the damage to or loss of property occurs *in the United States*." (emphasis in original)). The Sidermans have never relied upon section 1605(a)(5), however, in asserting that jurisdiction exists over their claims for torture.

905, 108 S.Ct. 1077, 99 L.Ed.2d 236 (1988). The House Report accompanying the passage of the FSIA gives three examples of an implied waiver:

> With respect to implicit waivers, the courts have found such waivers in cases where a foreign state has agreed to arbitration in another country or where a foreign state has agreed that the law of a particular country should govern a contract. An implicit waiver would also include a situation where a foreign state has filed a responsive pleading in an action without raising the defense of sovereign immunity.

H.R.Rep. No. 1487, 94th Cong., 2d Sess. 18 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6617. The House Report does not purport to provide an exclusive list of the circumstances giving rise to implied waivers, however, and we have not construed it in this fashion. Thus, while we stated in *Joseph* that implied waivers will "ordinarily [be] found" only in the three situations mentioned in the legislative history, 830 F.2d at 1022 (citing *Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 377 (7th Cir.1985)), we went beyond those examples to establish the more general proposition that where a written agreement entered into by a foreign sovereign "contemplates adjudication of a dispute by the United States courts," we will find the sovereign to have waived its immunity. *Joseph*, 830 F.2d at 1023.

We concluded in *Joseph* that the Federal Republic of Nigeria, by signing a lease agreement which stated that the prevailing party in any court dispute arising out of its terms would be entitled to attorney's fees, had rendered itself susceptible to suit in our courts. The lease did not provide specifically for the adjudication of disputes in the United States. Nor did it state that United States law would govern such actions. Thus, it did not fall into one of the categories mentioned by the House Report. However, because the lease at issue concerned a house in San Francisco which Nigeria had rented as a consulate, we surmised that Nigeria must have had United States courts in mind when it agreed to its adjudicatory provisions. And since Nigeria could reasonably be said to have contemplated "participation of the United States courts in [its] disputes" with its landlord, 830 F.2d at 1023, we found it to have waived its immunity from a suit brought by that landlord.

Other courts have similarly focused on the question whether a sovereign defendant entering into a written agreement envisioned the involvement of United States courts in its dealings with another party. In *Maritime Int'l Nominees Establishment v. Republic of Guinea*, 693 F.2d 1094 (D.C.Cir.1982), *cert. denied*, 464 U.S. 815, 104 S.Ct. 71, 78 L.Ed.2d 84 (1983), for example, the D.C. Circuit declined to find a waiver of immunity where the treaty on which the plaintiff premised its waiver argument "concededly did not foresee a role for the United States courts...." *Id.* at 1104. Similarly, in *Frolova*, the Seventh Circuit held that the former Soviet Union had not waived its immunity in signing various international agreements where it could not have "anticipated ... that American courts would be the means by which the documents' provisions would be enforced." And in *Liberian Eastern Timber Corp. v. Republic of Liberia*, 650 F.Supp. 73, 76 (S.D.N.Y.1986), *aff'd*, 854 F.2d 1314 (2d Cir.1987), Judge Weinfeld found that Liberia had waived its immunity from the enforcement of an arbitration award by entering into a treaty which "clearly contemplated the involvement of the courts of any of the Contracting States, including the United States as a signatory to the Convention, in enforcing the pecuniary obligations of the award." *Cf. Amerada Hess*, 488 U.S. at 442–43, 109 S.Ct. at 692 (finding no basis for concluding that Argentina had waived its immunity, explicitly or implicitly, "by signing an international agreement that contains no mention of a waiver of immunity to suit in United States courts or even the availability of a cause of action in the United States.").

 Thus, the essential inquiry in written agreement cases is whether a sovereign contemplated the involvement of United States courts in the affair in issue. Here, we confront a situation where Argentina

apparently not only envisioned United States court participation in its persecution of the Sidermans, but by its actions deliberately implicated our courts in that persecution. The Sidermans have presented evidence that a year after Jose, Lea and Carlos Siderman fled Argentina in fear for their lives, the Argentine military authorities altered the Tucuman provincial land records to show that they had held title only to 127, as opposed to 127,000, acres of land in the Province, and that in their last-minute efforts to raise cash they had thus sold property which did not belong to them. The Tucuman Public Prosecutor then initiated criminal proceedings against Jose Siderman for this "fraudulent" sale, and had the Tucuman Supreme Court enlist the aid of our courts, via a letter rogatory, in serving him with process.[18] The letter rogatory, dated May 11, 1980, informed the Presiding Judge of the Los Angeles Superior Court that criminal proceedings were pending against Jose Siderman in the Supreme Court of Tucuman. It requested the court's assistance in serving papers on Siderman, who was living in Los Angeles at the time. While the court complied with the request, the record is not clear as to the subsequent course of the lawsuit. In their papers in support of jurisdiction, the Sidermans suggest that the Argentine military authorities sought to obtain Jose's return to Argentina in order to further torture and perhaps even to kill him.[19]

Shortly after the Los Angeles Superior Court received Argentina's letter rogatory, indeed, Argentina requested that the Italian authorities arrest Siderman, who had travelled to Italy for a wedding, and extradite him to Argentina for having allegedly forged certain travel documents. Siderman was detained in Italy for seven months, twenty-seven days of which time was spent in prison, before an Italian court dismissed the charges against him as pretextual and denied Argentina's extradition request.

We conclude that the Sidermans have presented evidence sufficient to support a finding that Argentina has implicitly waived its sovereign immunity with respect to their claims for torture. The evidence indicates that Argentina deliberately involved United States courts in its efforts to persecute Jose Siderman. If Argentina has engaged our courts in the very course of activity for which the Sidermans seek redress, it has waived its immunity as to that redress.

█ As noted, Argentina will have an opportunity to rebut the Siderman's evidence on remand. We do not suggest that because Argentina may have implicitly waived its immunity in this suit, any foreign sovereign which takes actions against a private party in our courts necessarily opens the way to all manner of suit by that party. To support a finding of implied waiver, there must exist a direct connection between the sovereign's activities in our courts and the plaintiff's claims for relief. Only because the Sidermans have presented evidence indicating that Argentina's invocation of United States judicial authority was part and parcel of its efforts to torture and persecute Jose Siderman have they advanced a sufficient basis for invoking that same authority with respect to their causes of action for torture. It will be up to the district court on remand to determine whether the requisite direct connection exists. If it does, Argentina will be subject to the court's jurisdiction for the torture claims.

---

**18.** The Sidermans have presented material indicating that after the military coup in 1976, the Argentine courts were transformed into puppets of the military regime. In addition to presenting general evidence of this transformation, the Sidermans have alleged that those judges who stood in the way of the authorities' efforts to expropriate their properties were mysteriously removed from office while other, more "loyal", judges were used to legitimize the activities of the new government.

**19.** In its letter to the United States Department of State declaring immunity from the Sidermans' suit, dated February 16, 1983, Argentina stated that Jose Siderman's presence before the Supreme Court of Tucuman was desired in relation to the property fraud charges. The letter noted Argentina's request of assistance from the Superior Court of Los Angeles in the matter.

The district court erred in dismissing the Sidermans' torture claims.

### CONCLUSION

The Sidermans' complaint and the evidence they have presented in support of their allegations paint a horrifying portrait of anti-Semitic, government-sponsored tyranny. The record that so far has been developed in this case reveals no ground for shielding Argentina from the Sidermans' claims that their family business was stolen from them by the military junta that took over the Argentine government in 1976. It further suggests that Argentina has implicitly waived its sovereign immunity with respect to the Sidermans' claims for torture.

We REVERSE and REMAND for further proceedings consistent with this opinion.