Christopher P. BLAXLAND; Marcella Blaxland, Plaintiffs–Appellees,

v.

COMMONWEALTH DIRECTOR OF PUBLIC PROSECUTIONS; Australian Securities and Investments Commission, Defendants–Appellants,

and

Paul R. Shaw; Dennis T. Barry, Defendants.

Christopher P. Blaxland; Marcella Blaxland, Plaintiffs–Appellants,

v.

Commonwealth Director of Public Prosecutions; Australian Securities and Investments Commission; Paul R. Shaw; Dennis T. Barry, Defendants–Appellees.

Nos. 00–56330, 00–56376.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 3, 2001.

Filed March 27, 2003.

**1200**

Andrea Sheridan Ordin, Steven J. Glouberman, Morgan, Lewis & Bockius LLP, Los Angeles, CA, Mark N. Bravin, Morgan, Lewis & Bockius LLP, Washington, D.C., for the defendants-appellants-cross-appellees.

Christopher P. Blaxland, Manhattan Beach, CA, for the plaintiffs-appellees-cross-appellants.

Douglas Hallward–Driemeier, United States Department of Justice, Civil Appellate Staff, Washington, DC, for Amicus Curiae.

Before PREGERSON, TASHIMA and BERZON, Circuit Judges.

**OPINION**

BERZON, Circuit Judge.

Christopher Blaxland[1] brought a tort action in the Superior Court of California against, *inter alia*, two separate instrumentalities and two individual employees of the Australian government. Australia removed the case to federal district court and moved to dismiss on the ground of sovereign immunity, under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602 *et seq.* The district

---

**1.** Both Christopher Blaxland and his wife Marcella Blaxland are plaintiffs in this suit. For convenience, we sometimes refer to them collectively as "Blaxland".

court denied Australia's motion and Australia appeals. Blaxland cross-appeals the district court's grant of sovereign immunity to the individual defendants. We conclude, contrary to the district court, that Australia is entitled to immunity under the FSIA for the alleged torts. We also affirm the district court's grant of sovereign immunity to individual defendants Shaw and Barry.

## FACTS

On reviewing a motion to dismiss, we accept the allegations of the complaint as true. *Manistee Town Ctr. v. City of Glendale*, 227 F.3d 1090, 1091 (9th Cir.2000). The facts that follow are therefore solely those alleged in the complaint, which we assume to be true for purposes of this opinion.

Plaintiff–Appellee Christopher Blaxland is a legal resident of the United States, domiciled in California. From 1986 to 1989, Blaxland was a director of ATS Resources Limited (ATSR), an Australian publicly-listed company. Blaxland was also a director of several affiliated corporations. Blaxland resigned as a director of ATSR and the affiliated corporations in 1989.

Blaxland was later charged with two offenses allegedly committed while he was a director of ATSR and the other corporations: (1) acting as a director with intent to defraud; and (2) making "improper use" of his officer position within a corporation. These charges were filed against him for an ulterior purpose by the Director of Public Prosecutions (DPP) and the Australian Securities and Investments Commission (ASIC), and their employees, Paul Shaw and Dennis Barry. The motive was the DPP's and the ASIC's desire to "claim a political victory for the purpose of attracting favorable publicity while simultaneously causing Mr. Blaxland to suffer prejudicial publicity as a result of his arrest and extradition." The political victory was important to the DPP and the ASIC, because "every criminal case involving the affairs of ATSR which had gone to trial had resulted in an acquittal;" the investigations into ATSR and the corresponding prosecutions had cost millions of dollars; and the DPP and the ASIC were therefore "under great pressure to show results." The charges lacked any factual foundation.

After learning of the charges against him, Blaxland traveled to Sydney, Australia to appear before the local court. Delays in the Australian court system caused Blaxland's case to be continued for three and a half years. During this time, Blaxland appeared in person or through counsel at all hearings for the case.

The trial was set to start in September 1995. Blaxland was unable to travel to Australia at that time because his seven-year-old son required surgery for a life-threatening condition. Blaxland sent affidavit evidence to the Australian court, alerting the court to his son's condition and requesting a continuance to allow him to attend to his son's medical needs. In response to Shaw's insistence that Blaxland's request be denied, the court refused Blaxland's request and issued a bench warrant for his arrest.

Shaw and Barry each swore to affidavits that contained false and misleading evidence; each knew that the affidavits were perjured. The affidavits were included in Australia's extradition request filed with the United States Department of State.

After the request for Blaxland's extradition was received, the United States Attorney's Office issued a complaint for Blaxland's arrest pursuant to the extradition treaty between the United States and Australia. On Sunday, July 20, 1997, armed United States marshals arrested Blaxland at his home in Los Angeles.

Blaxland was then brought before a magistrate judge in district court in Los Angeles. Shaw swore to a further affidavit, introduced before the magistrate judge, that contained additional perjured statements designed to ensure that Blaxland was not granted bail. Blaxland was nonetheless released on bail, but, pursuant to the DPP's and Shaw's request, the United States Attorney appealed the decision and bail was revoked on July 25th.

After the bail revocation, Blaxland made numerous offers to the DPP to go to Australia voluntarily and waive his right to an extradition hearing. In return, Blaxland asked that he be allowed to take with him material that he needed for his defense. These offers were rejected. Shaw informed Blaxland's counsel that he wanted Blaxland formally extradited and kept in jail until trial.

Before Blaxland's extradition hearing, Barry swore out another affidavit containing further perjured testimony. Blaxland's extradition hearing was held on August 29, 1997, after which the district court ordered extradition. Blaxland spent two additional months incarcerated in Los Angeles before he was extradited on October 31.

After spending two weeks in a Sydney jail, Blaxland was granted bail subject to onerous conditions requested by Shaw and the DPP. For example, Blaxland was required to report to the local police station twice every day. On April 30, 1998, Blaxland sought to have his bail conditions relaxed so that he could return to Los Angeles to be with his family. His wife, Marcella, needed surgery, and his son, Brandon, had been "diagnosed with toxoplasmosis (a virulent parasitic disease which attacks the victim's vision and which had resulted in blindness in Brandon's right eye)." Blaxland also hoped to earn some money by working in Los Angeles. Shaw and the DPP opposed the change in bail conditions, and the court refused Blaxland's application.

One week before the trial date, the DPP dropped the fraud charge against Blaxland. The trial for the charge of making improper use of his position as an officer of a corporation lasted roughly two and a half weeks. The jury took less than one hour to acquit Blaxland. By that point, Blaxland had been separated from his family for one year and two months. He had spent four months in jail.

## PROCEEDINGS

After returning to California, Blaxland filed suit in the Los Angeles Superior Court against the DPP, the ASIC, Shaw, and Barry. The complaint alleges that the DPP, the ASIC, Shaw, and Barry made false or misleading statements in affidavits submitted by the U.S. Attorney to secure Blaxland's arrest and extradition; that the DPP, the ASIC, Shaw, and Barry wrongfully opposed Blaxland's bail applications; that these actions were taken pursuant to a scheme to coerce Blaxland into accepting a plea agreement; and that the Australian defendants sought a plea agreement because they knew that they did not have enough evidence to convict Blaxland. A plea bargain would have allowed them to claim the political victory they desired.

Blaxland's complaint asserted four causes of action on behalf of Mr. Blaxland: (1) malicious prosecution; (2) abuse of process; (3) intentional infliction of emotional distress; and (4) false imprisonment. The complaint also alleged two causes of action on behalf of Mrs. Blaxland: (1) loss of consortium; and (2) intentional infliction of emotional distress.

The case was removed to the Central District of California. The DPP, the ASIC, Shaw, and Barry filed a motion to dismiss for lack of subject matter jurisdiction. They claimed sovereign immunity

pursuant to the FSIA. The district court granted the motion to dismiss for lack of jurisdiction as to Shaw and Barry but denied it as to the DPP and the ASIC. Australia appeals the denial of the motion to dismiss as to the DPP and the ASIC. Blaxland cross-appeals the district court's dismissal of Shaw and Barry.

## DISCUSSION

■ The denial of a motion to dismiss for foreign sovereign immunity is an immediately appealable collateral order. *Compania Mexicana De Aviacion, S.A. v. U.S. Dist. Court for the Cent. Dist. of Cal.*, 859 F.2d 1354, 1356 (9th Cir.1988). The existence of subject matter jurisdiction under the FSIA is a question of law reviewed de novo. *Corzo v. Banco Cent. de Reserva del Peru*, 243 F.3d 519, 522 (9th Cir.2001).

Australia, like other nations, is generally immune from suit in the United States in both federal and state courts. 28 U.S.C. § 1604. It is undisputed that the DPP and the ASIC are instrumentalities of the Australian Government and are thereby entitled to the same sovereign immunity as Australia. There are certain exceptions to Australia's sovereign immunity under the FSIA. Blaxland contends that his case falls under two of these: 28 U.S.C. § 1605(a)(5) and 28 U.S.C. § 1605(a)(1).

### I

■ Section 1605(a)(5)(B) states:

A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case ...

... (5) not otherwise encompassed in paragraph (2) above, in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to ...

... (B) any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.

Blaxland's action is a tort and he does allege harms that occurred in the United States. The pertinent question is whether § 1605(a)(5) permits this suit or whether the § 1605(a)(5)(B) limitation on the domestic tort exception applies.

Plainly, § 1605(a)(5)(B) bars Blaxland's malicious prosecution and abuse of process claims from falling under the § 1605(a)(5) exception to sovereign immunity. Blaxland does not contend otherwise. Because § 1605(a)(5)(B) refers to "any claim arising out of malicious prosecution[or] abuse of process," Blaxland's emotional distress and loss of consortium claims are also barred, since they "arise from" the core claims and derive from the same corpus of allegations concerning his extradition. *Cf. Leipart v. Guardian Indus.*, 234 F.3d 1063, 1071 (9th Cir.2000) (characterizing emotional distress and loss of consortium claims as "derivative" of underlying products liability claims).

■ Section 1605(a)(5)(B) does not, however, exclude claims for false imprisonment from the § 1605(a)(5) tort exemption. Blaxland's false imprisonment claim fails, however, for a different reason: False imprisonment is the wrong tort for the conduct alleged.

■ "[W]e look beyond [the complaint's] characterization to the conduct on which the claim is based." *Mt. Homes, Inc. v. United States*, 912 F.2d 352, 356 (9th Cir. 1990) (finding that a claim characterized in a complaint as negligent preparation of cost estimate sheets and contracts was actually one for negligent misrepresentation

and was therefore barred by the Federal Tort Claims Act). ·

Blaxland was imprisoned in the United States by American law enforcement authorities on Australia's request, according to the procedures laid out in the Treaty of Extradition between the United States and Australia. *See* Treaty of Extradition Between the United States of America and Australia, May 14, 1974, U.S.-Austl., 27 U.S.T. 957 ("Extradition Treaty"). Blaxland does not contend otherwise. He is not suing the United States for imprisoning him. Instead, he is suing instrumentalities and employees of the Australian government for invoking the extradition procedures with perjured evidence and for a malicious purpose. These actions, if true, could constitute malicious prosecution or abuse of process, but not false imprisonment.

In identifying Blaxland's causes of action as claims for malicious prosecution and abuse of process rather than false imprisonment, we need not decide whether Congress intended the terms "malicious prosecution" and "abuse of process" in § 1605(a)(5)(B) to be defined according to a uniform federal standard or according to applicable state law. *Cf. Taylor v. United States,* 495 U.S. 575, 592, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990) (deciding that Congress meant for 18 U.S.C. § 924(e)'s use of the word "burglary" to be defined according to a uniform federal standard rather than according to the various definitions of the states). The fact that Blaxland's claims are for malicious prosecution and abuse of process rather than false imprisonment flows from a universal distinction between the first two torts on the one hand and the third tort on the other.

Under either California law[2] or more general legal principles as expressed, for example, in the Restatement (Second) of Torts, abuse of process and malicious prosecution concern the wrongful use of legal process. *See, e.g., Vanzant v. Daimler-Chrysler Corp.,* 96 Cal.App.4th 1283, 118 Cal.Rptr.2d 48, 52 (2002) ("The tort of malicious prosecution recognizes the right of an individual to be free from unjustifiable litigation or criminal prosecution."); *Brown v. Kennard,* 94 Cal.App.4th 40, 113 Cal.Rptr.2d 891, 894 (2001) ("To succeed in an action for abuse of process, a litigant must establish two elements: that the defendant (1) contemplated an ulterior motive in using the process; and (2) committed a willful act in the use of the process not proper in the regular conduct of the proceedings. In other words, abuse of process requires an act outside the purpose of the process." (footnote omitted)); Restatement (Second) of Torts § 653 (1976 Main Vol.) ("A private person who initiates or procures the institution of criminal proceedings against another who is not guilty of the offense charged is subject to liability for malicious prosecution if (a) he initiates or procures the proceedings without probable cause and primarily for a purpose other than that of bringing an offender to justice, and (b) the proceedings have terminated in favor of the accused."); *id.* § 682 ("One who uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed, is subject to liability to the other for harm caused by the abuse of process.").

■ The tort of false imprisonment, on the other hand, concerns the violation of

---

**2.** In this case, California law would apply because the alleged harm took place there. *See First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 622 n. 11, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983)

("where state law provides a rule of liability governing private individuals, the FSIA requires the application of that rule to foreign states in like circumstances").

someone's liberty of movement—imprisoning someone—without the authority of legal process. In California, for example, the elements of false imprisonment are: "1) the nonconsensual, intentional confinement of a person, 2) without lawful privilege, and 3) for an appreciable period of time, however brief." *Easton v. Sutter Coast Hosp.,* 80 Cal.App.4th 485, 95 Cal. Rptr.2d 316, 323 (2000) (citation omitted); [3] *see also Randle v. City and County of San Francisco,* 186 Cal.App.3d 449, 230 Cal. Rptr. 901, 905 (1986) ("False arrest or imprisonment and malicious prosecution are mutually inconsistent concepts, the former relating to conduct that is without valid legal authority and the latter to conduct where there is valid process or due authority." (citation omitted)).

■■■ As noted, California is by no means unusual in this regard, but simply applies a generally recognized distinction. *See* Restatement (Second) of Torts § 35 cmt. a (1976 Main Vol.) ("At common law, the appropriate form of action for imposing a confinement was trespass for false imprisonment except where the confinement was by arrest under a valid process issued by a court having jurisdiction, in which case the damages for the confinement were recoverable, if at all, as part of the damages in an action of trespass on the case for malicious prosecution or abuse of process. Therefore, an act which makes the actor liable under this Section for a confinement otherwise than by arrest under a valid process is customarily called a false imprisonment."); *id.* § 37 cmt. b("*Malicious prosecution and abuse of process.* One who institutes criminal proceedings against another intends to cause an arrest which is the normal incident of such proceedings. In such case, however, the actor is liable only if the confinement which the arrest involves is a part of the greater offense of instituting such proceedings without reasonable cause and for a purpose other than that for which the proceedings are provided."); Fowler V. Harper et al., The Law of Torts § 3.9, at 36(3d ed. 1996) ("If the imprisonment is under legal process but the action has been carried on maliciously and without probable cause, it is malicious prosecution. If it has been extra judicial, without legal process, it is false imprisonment." (internal quotation marks and citation omitted)).[4]

---

**3.** In *Easton,* for example, defendant paramedics demurred to a claim of false imprisonment by a patient who alleged that he was brought to a hospital against his will. The court sustained the demurrer because a California statute authorizes bringing an individual to a hospital under the circumstances alleged. *Easton,* 95 Cal.Rptr.2d at 323–24.

**4.** We note that California law does allow false imprisonment claims for arrests by law officers in two situations: when an arrest is made without a warrant, *see, e.g., Jackson v. City of San Diego,* 121 Cal.App.3d 579, 175 Cal.Rptr. 395, 399 (1981), *overruled on other grounds by Asgari v. City of Los Angeles,* 15 Cal.4th 744, 63 Cal.Rptr.2d 842, 937 P.2d 273, 281 n. 10 (1997), and when an officer "maliciously arrests and imprisons another by personally serving an arrest warrant issued solely on information deliberately falsified by the arresting officer himself," *McKay v. County of San Diego,* 111 Cal.App.3d 251, 168 Cal.Rptr. 442, 443 (1980).

As to the first situation, Blaxland's complaint specifies that he was arrested according to a magistrate's order. In the extradition context, such an order is the procedural equivalent of an arrest warrant. So, although legal process was allegedly misused, the arrest was still made under the authority of legal process.

As for *McKay,* we understand it to hold that where an arresting officer serves a warrant he or she procured fraudulently, the arrest warrant is simply a ruse and no longer part of an independent legal process. In Blaxland's case, the imprisoning agents were the United States and its law enforcement officials, rather than the Australian instrumentalities that Blaxland is suing. Although on Blaxland's contention the underlying complaint was based on false information provided by Aus-

Blaxland does not allege that Australia extra-judicially imprisoned him, but rather that Australia misused legal procedures to detain, extradite, and prosecute him. Blaxland cannot overcome sovereign immunity for claims of malicious prosecution and abuse of process by calling them a different name.

## II

■ Section 1605(a)(1) does, however, create an exception to sovereign immunity for cases

in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver.

28 U.S.C. § 1605(a)(1). We are faced with the question whether this waiver provision applies to Australia's alleged actions related to Blaxland's extradition.

■ As an initial matter, we agree with Blaxland that a foreign country's use of United States courts can be sufficient to trigger a § 1605(a)(1) implied waiver under *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699 (9th Cir.1992). We held in *Siderman* that Argentina impliedly waived sovereign immunity as to plaintiff Siderman's causes of action for torture and expropriation. In that case, the Argentine military junta imprisoned and tortured Siderman in 1976 because he was Jewish. When released from prison, Siderman fled to the United States. The government of Argentina continued to persecute him by bringing a bogus fraud action in an Argentine court. Argentina filed a letter rogatory with the Los Angeles Superior Court to request assistance in serving papers on Siderman—a Los Angeles resident at the time—concerning the

fraud action. We held that since "Argentina has engaged our courts in the very course of activity for which the Sidermans seek redress, it has waived immunity as to that redress." *Id.* at 722.

*Siderman* remains good law in this circuit. A crucial difference distinguishes this case from *Siderman,* however, and compels the conclusion that Australia did not impliedly waive its sovereign immunity by seeking and obtaining Blaxland's extradition.

Here, the Australian government did not itself apply to our courts for assistance but instead invoked its rights under the Extradition Treaty by applying to the executive branch of our government. Australia's invocation of its extradition treaty rights, unlike Argentina's direct engagement of our courts in *Siderman,* cannot constitute an implied waiver of sovereign immunity.

*Siderman* involved Argentina's issuance of a letter rogatory to an American court. A letter rogatory is a direct communication from the courts of one country to the courts of another. *See* Black's Law Dictionary (7th ed.1999) (defining letter rogatory as a "document issued from one court to a foreign court"); *In re Letter Rogatory from the Justice Court, Dist. of Montreal, Can.,* 523 F.2d 562, 563 n. 1 (6th Cir.1975) ("Letters rogatory are the medium, in effect, whereby one country, speaking through one of its courts, requests another country, acting through its own courts and by methods of court procedure peculiar thereto and entirely within the latter's control, to assist the administration of justice in the former country . . . ." (internal quotation marks and citation omitted)).

We emphasized in *Siderman* that "[t]he FSIA's waiver exception is narrowly con-

---

tralia, the arrest itself was made according to legal process and by parties not accused of

independent wrongdoing.

strued," and that "[t]o support a finding of implied waiver [of sovereign immunity], there must exist a direct connection between *the sovereign's activities in our courts* and the plaintiff's claims for relief," 965 F.2d at 720, 722 (emphasis added). By petitioning the Los Angeles Superior Court via a letter rogatory, the Argentine government, we held in *Siderman,* engaged the American courts sufficiently to waive its immunity by implication. In this case, by contrast, we confront only the invocation by Australia of proceedings to secure Blaxland's extradition *under the auspices of the executive branch of our government.*[5]

 Unlike a letter rogatory, which is a direct court-to-court request, extradition is a diplomatic process carried out through the powers of the executive, not the judicial, branch. *See, e.g., Lopez–Smith v. Hood,* 121 F.3d 1322, 1326(9th Cir.1997) ("Extradition is a matter of foreign policy entirely within the discretion of the executive branch, except to the extent that [a] statute interposes a judicial function." (citations omitted)); *Martin v. Warden, Atlanta Pen.,* 993 F.2d 824, 828 (11th Cir. 1993) ("Extradition is an executive, not a judicial, function. The power to extradite derives from the President's power to conduct foreign affairs." (citations omitted)). Thus, the nation seeking extradition does not directly contact the courts of the requested country. Rather, the foreign government makes its extradition request to the U.S. Department of State. *See generally Barapind v. Reno,* 225 F.3d 1100, 1105 (9th Cir.2000) (explaining extradition process). After the request has been evaluated by the State Department to determine whether it is within the scope of the relevant extradition treaty, a United States Attorney, if so instructed, files a complaint in federal district court seeking an arrest warrant for the person sought to be extradited. *Id.*

Thus, all extradition-related judicial proceedings are initiated and conducted by the U.S. Department of Justice. The executive branch conducts the procedure on behalf of the foreign sovereign. The foreign sovereign makes no direct request of our courts, and its contacts with the judiciary are mediated by the executive branch. *Cf. In re Republic of the Philippines,* 309 F.3d 1143, 1151–52 (9th Cir. 2002) (finding no intent to waive sovereign immunity in a Philippine executive order that did not institute court proceedings and "on its face contemplates executive action by foreign governments"); *Siderman,* 965 F.2d at 722("Only because the Sidermans have presented evidence indicating that *Argentina's invocation of United States judicial authority* was part and parcel of its efforts to torture and persecute Jose Siderman have they advanced a sufficient basis for invoking that same authority with respect to their causes of action for torture." (emphasis added)).

Consistent with these principles, the extradition treaty between the United States and Australia provides that extradition be initiated through diplomatic channels and that decisions also be communicated diplomatically. Extradition Treaty, arts. XI, XVI ("The request for extradition shall be made through the diplomatic channel.... The requested State shall promptly communicate to the requesting State through the diplomatic channel the decision on the

---

**5.** Blaxland's complaint makes clear that it was the American, not the Australian government, that participated in the extradition proceeding: "When Mr. Blaxland's attorney attempted to argue that certain of the evidence contained in Shaw's and Barry's affidavits was false, the U.S. Attorney acting on behalf of the Australian government ... objected. As a result, the court ruled ... that it was legally bound to accept the sworn evidence tendered on behalf of the Australian government."

request for extradition."). Nothing in the Extradition Treaty indicates an intent to waive sovereign immunity in extradition proceedings.[6] *See id.*

Additionally, American judicial officers conduct a circumscribed inquiry in extradition cases. *See* 18 U.S.C. § 3184; *United States v. Lui Kin–Hong*, 110 F.3d 103, 110 (1st.Cir.1997) ("[I]nquiry is limited to a narrow set of issues concerning the existence of a treaty, the offense charged, and the quantum of evidence offered."). If the evidence is sufficient to sustain the charge, the inquiring magistrate judge is required to certify the individual as extraditable to the Secretary of State and to issue a warrant. *Lopez–Smith*, 121 F.3d at 1326.

Once a magistrate judge confirms that an individual is extraditable, it is the Secretary of State, representing the executive branch, who determines whether to surrender the fugitive. *Lui Kin–Hong*, 110 F.3d at 110("The larger assessment of extradition and its consequences is committed to the Secretary of State."); *see also* 18 U.S.C. § 3186 ("The Secretary of State *may* order the person committed under sections 3184 or 3185 of this title to be delivered to any authorized agent of such foreign government." (emphasis added)). It is a generally established principle, one consistent with Article XVI of the Extradition Treaty in this case,[7] that "[t]he Secretary of State, exercising executive discretion through delegation of this authority by the President, may refuse to extradite a relator despite a judicial determination that extradition would be compatible with the terms of the applicable treaty." *Lopez–Smith*, 121 F.3d at

1326(internal quotation marks and citation omitted). Thus, the executive branch's ultimate decision on extradition may be based on a variety of grounds, ranging from individual circumstances, to foreign policy concerns, to political exigencies. *See id.*

The uniqueness of the extradition process is further demonstrated by the rule of non-inquiry. While potential abuses in the requesting country rising to the level of torture are reviewable by American courts, *Barapind*, 225 F.3d at 1106, judges generally "refrain from examining the penal systems of requesting nations, leaving to the Secretary of State determinations of whether the defendant is likely to be treated humanely." *Lopez–Smith*, 121 F.3d at 1326–27(citations omitted). As we have stated, the rule of non-inquiry limits the judicial role, although "it is not that questions about what awaits the relator in the requesting country are irrelevant to extradition; it is that there is another branch of government, which has both final say and greater discretion in these proceedings, to whom these questions are more properly addressed." *Lui Kin–Hong*, 110 F.3d at 111.

Extradition treaties have produced a global network of bilateral executive cooperation that aims to prevent border crossing from becoming a form of criminal absolution. Unwarranted expansion of judicial oversight may interfere with foreign policy and threaten the ethos of the extradition system.

Expressing these kinds of concerns, the Supreme Court of Canada recently con-

---

**6.** If it were otherwise—if foreign governments' invocations of extradition treaty rights impliedly waived sovereign immunity—the United States could be subject to suits in courts around the world in connection with its own extradition efforts.

**7.** Article XVI(2) of the treaty states: "If the [extradition] request is denied in whole or in part, the requested State shall provide information as to the reasons for the denial of the request. The requested State shall provide copies of pertinent judicial decisions on request."

cluded that a foreign sovereign does not waive its sovereign immunity under the Canadian State Immunity Act by seeking extradition. *Schreiber v. Canada (Attorney General),* 2002 SCC 62. In addressing tort claims against the German government, *Schreiber* examined a very similar question to that raised in this case under the FSIA and held that by requesting extradition, Germany had not "initiate[d] proceedings" in a court that would negate its immunity under the Canadian Act. *Id.* at ¶ 20. Instead, the Canadian Court noted that

> Germany['s] request to arrest and imprison the appellant was made to the executive branch of government pursuant to the Extradition Treaty. It was the [executive branch which applied] for an arrest warrant.... There is nothing in the wording of the legislation or in the Extradition Treaty, to suggest that Germany would impliedly waive its sovereign immunity from law suits in the Canadian courts every time it exercised its treaty-based right to request extradition.

*Id.* at ¶ 24.

The Supreme Court of Canada concluded in *Schreiber* that "it would be contrary to the concepts of comity and mutual respect between nations to hold that a country that calls upon Canada to assist in extradition only does so at the price of losing its sovereign immunity and of submitting to the domestic jurisdiction of Canadian courts in matters connected to the extradition request, and not only in respect of the extradition proceeding itself." *Id.* at¶ 27. We conclude, similarly, that given the executive-focused nature of the extradition process, Australia did not impliedly waive its sovereign immunity by extraditing Blaxland pursuant to the Extradition Treaty.

Our conclusion holds whether or not Australia's use of the extradition process was fraudulent. Contrary to Blaxland's argument, a foreign sovereign's responsibility for documents filed in American courts as part of the extradition process cannot constitute an implied waiver of sovereign immunity under § 1605(a)(1), for the purpose—but only for the purpose—of claims arising from domestic torts of malicious prosecution and abuse of process. There cannot be *implied* waiver of sovereign immunity, for purposes of claims that malicious prosecution and abuse of process occurred in this country, solely through tortious conduct limited to the very activities that constitute those torts, as any other conclusion would void the operation of § 1605(a)(5)(B). Were the waiver explicit, or were the tort causes of action alleged ones that do not turn on activities in court—such as libel, for example—recognizing a waiver would not render null the explicit exceptions contained in § 1605(a)(5)(B). Such circumstances are not present here, however. We find no waiver of sovereign immunity by Australia.

### III

Blaxland cross-appeals the district court's dismissal of his claims against Shaw and Barry as individuals. In *Chuidian v. Philippine Nat'l Bank,* 912 F.2d 1095, 1103 (9th Cir.1990), we concluded that the FSIA applies to "individuals sued in their official capacity." Blaxland agrees that the FSIA should apply to Shaw and Barry; his argument is that the two men should fit under the same exceptions he claims apply to Australia. The claims against Shaw and Barry therefore rise and fall with those against the DPP and the ASIC.

### CONCLUSION

We conclude that Blaxland's claim that abuse of process, malicious prosecution, and related torts occurred is barred by the FSIA. In No. 00–56330, we reverse the

district court's denial of sovereign immunity for the DPP and the ASIC. In No. 00–56376, we affirm the district court's grant of sovereign immunity to Shaw and Barry.

REVERSED in part, AFFIRMED in part and REMANDED with directions to dismiss.